## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MELISSA PEREZ , | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-CV-1788 |
| | ) | |
| v. | ) | Judge John Robert Blakey |
| | ) | |
| COOK COUNTY SHERIFF'S | ) | |
| OFFICE et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Melissa Perez ("Plaintiff"), a correctional officer at the Cook County Jail, sued her employer, the Cook County Sheriff's Office ("Sheriff's Office"), and Cook County (collectively, "Defendants") after a superior officer allegedly sexually harassed and mistreated her for taking approved intermittent Family Medical Leave Act ("FMLA") leave. [1]. The Court disposed of some of Plaintiff's claims on a motion to dismiss but allowed her to proceed on her claims for hostile work environment (Counts I & III); Title VII retaliation (Count VIII); and FMLA retaliation (Count XII). [22]. Defendants now move for summary judgment on these counts, [58], and to strike the sur-rebuttal report of Plaintiff's expert, Dr. Angela Lawson, [61]. For the reasons explained below, the Court grants in part, and denies in part, Defendants' motion for summary judgment, [58], and denies Defendants' motion to strike, [61].

I.    **Summary of the Facts**[1]

A.    **Organizational Structure**

Plaintiff joined the Sheriff's Office as a Correctional Officer in 2005.  [69] ¶ 3.
The chain of command there consists of Correctional Officer, Sergeant, Lieutenant,
and Superintendent.  *Id*. ¶ 6.  Since 2010, Plaintiff has worked in the Receiving
Division and was initially assigned to the Cook County Jail ("the Jail"), where her
responsibilities included processing new detainees.  *Id*. ¶¶ 3, 16.  In early 2014, she
was assigned to Remote Booking, which is part of the Receiving Division.  *Id*. ¶¶ 17,
22.  Correctional Officers assigned to Remote Booking work at one of Cook County's
courthouses.  *Id*. ¶ 17.  Plaintiff was assigned to the Domestic Violence Court ("the
DVC").  [69] ¶ 22.  At the DVC, Plaintiff still processed new detainees, but the parties
dispute whether the volume of detainees she processed, offenses of which the
detainees were charged, and some of her daily tasks differed from her role at the Jail.
*Id*. ¶¶ 17–18; [84] ¶ 9.  They also dispute whether Correctional Officers assigned to
the Jail face a greater risk of violence than those assigned to Remote Booking.  *See*
[68] at 3, 13; [84] ¶¶ 8–9.

At all times relevant, Lieutenant Charles Luna ("Luna") oversaw Remote
Booking and the Correctional Officers assigned to it, including Plaintiff.  [69] ¶¶ 21,

---

[1] The Court takes these facts from Defendants' Local Rule 56.1 statement of facts, [60], Plaintiff's
response thereto, [69], Plaintiff's Statement of Additional Facts, [70], and Defendants' response,
thereto, [84].  Defendants argue that some of Plaintiff's responses to their factual statements
improperly assert facts that are not responsive and/or present evidence outside Plaintiff's personal
knowledge. [83] at 2 (taking issue with responses in [69] ¶¶ 8, 18, 42, 57, 62, 65, 67–69, 71).  The Court
disagrees.  Overall, Plaintiff's responses cite to the record and provide potentially relevant evidence.
While the parties disagree about the significance of the evidence, *see, e.g.,* [69] ¶¶ 8, 18, 65, 67, 69; or
the truth of a witness's statements, *id*., these disputes merely indicate possible issues of material fact.

25. Luna reported to the Superintendents of Receiving, including Superintendents Giunta ("Giunta") and Erica Queen ("Queen"). *Id*. ¶ 25.

In March 2016, the Sheriff's Office approved Plaintiff for intermittent FMLA leave to care for her husband, Noel Perez, who had cancer. [69] ¶ 40. This is when Plaintiff's problems allegedly began. As detailed below, in the months and years that followed, Luna ostensibly began making sexually explicit and crude comments to her. At the same time, he often ignored or denied her FMLA requests and repeatedly threatened to send her back to the Jail for taking FMLA leave.[2] All came to a head on April 27, 2018, when she was transferred back to the Jail.

## B. Plaintiff's FMLA Leave Issues and Luna's Alleged Sexual Harassment

In March 2016, Plaintiff asked Luna to approve an FMLA day so she could attend her husband's biopsy. [69] ¶ 41. Plaintiff alleges that, in response, Luna threatened to send her back to the Jail if she did not come to work. [84] ¶ 2. She told a fellow employee, Lieutenant DiCaro,[3] and he responded: "He can't deny it to you, so don't worry about it." [84] ¶ 3. Plaintiff took off the day. [69] ¶ 41.

That same month, Luna allegedly told Plaintiff over the phone that she should call or visit him because her husband's upcoming surgery would be stressful, and her husband would "need some time off." [69] ¶ 28. She perceived the comment as a

---

[2] According to Plaintiff, many of these events unfolded in phone conversations or text exchanges with Luna. Defendants often dispute that these conversations occurred as Plaintiff describes (or at all). *See generally* [59]; [84]. Unless otherwise noted in this opinion, Plaintiff's testimony suffices to create a material issue of fact regarding whether her exchanges with Luna occurred as she describes them.

[3] Lieutenant DiCaro worked in Court Service outside Plaintiff's chain of command. [84] ¶ 3.

3

sexual advance and hung up on him, but she did not tell him that his comment offended her or report it to anyone. *Id.*

Next, in July 2016 during a phone call, Luna allegedly told Plaintiff that her husband would not "be able to get it up" so she should come to Luna if she needed help. [69] ¶ 29. Again, Plaintiff took Luna's comment as a sexual advance and hung up on him but did not report the comment to anyone. *Id.* Soon after, in August 2016, she asked Luna to take off a few days in September to care for her husband. [69] ¶ 44. Luna initially failed to respond, then he told her he was attempting to find coverage, and then he denied her request via text, warning her that she had to show up or he would send her back to the Jail. *Id.* ¶¶ 45–46. She told two employees that Luna refused her FMLA request: (1) Mario Reyes, a director at the Jail; and (2) Mark Robinson, her Union Steward. [84] ¶¶ 14–15. Reyes told Plaintiff to "do what you have to do." *Id.* ¶ 14. Robinson suggested that she politely text Luna that she was taking off the days. *Id.* ¶ 15. Plaintiff took off the days and she was not sent back to the Jail. [69] ¶ 48.

Then, in October 2016, Plaintiff asked Luna about a possible transfer to a remote booking position at the 111th Street Courthouse. *Id.* ¶ 49. According to Plaintiff, in August Luna had told her that he would transfer her there when the position became available. *Id.* ¶ 43. Yet, he refused in October, telling her that "she chose her family over her job when she called in FMLA in September." *Id.* ¶ 50. Luna also told her that he wanted to transfer her back to the Jail, but Superintendent Queen told him to be "sympathetic to her situation." *Id.*

In November 2016, Plaintiff asked Luna for additional FMLA days off. Again, Luna did not respond. This time, Plaintiff reached out to Superintendent Giunta to complain. [84] ¶ 16. Giunta suggested that she return to the Jail where he could approve her days. *Id.* Plaintiff resisted, asking Giunta if he was trying to punish her for taking FMLA days. [69] ¶ 53. Giunta allegedly responded "forget it—I'll just approve your days." *Id.* (response).

Plaintiff's next issues arose after she took short-term disability beginning in April 2017 for a neck injury. [69] ¶ 30. While still on leave in July 2017, Luna allegedly said to her over the phone, "I'm going to have to take it easy on your neck. Are you still going to be able to take it deep?" *Id.* ¶ 31. Plaintiff hung up but she did not complain to anyone. *Id.* ¶ 32. Then, in September 2017, while still on disability, Plaintiff had an emergency hysterectomy. *Id.* ¶ 33. When Plaintiff told Luna, he allegedly responded, "oh something new to break in." *Id.* Again, she hung up but did not complain to anybody. *Id.* ¶¶ 33–34.

Plaintiff returned to work in October 2017. *Id.* ¶ 34. That same month, she asked Luna about moving to a newly opened early shift. *Id.* ¶ 35. He laughed, to which she responded, "Don't pull my leg and lead me on." *Id.* Allegedly, he replied, "I've got something for you to pull." *Id.* Again, she hung up, but she did not complain to anyone. *Id.* ¶ 26.

Then, toward the end of that same month, Plaintiff asked Luna for a few hours off (non-FMLA) over two days to care for her husband. *Id.* ¶¶ 54–55. Again, Luna

did not respond. *Id.* ¶ 55. This time, Plaintiff emailed Superintendent Queen. *Id.* ¶ 56. Her November 1, 2017 email states, in relevant part:

> It is about 24 hours before the first day is needed. I feel like I am being discriminated against because of FMLA....I feel like nothing is approved or denied until the last minute or I have to go the next person in charge. Last year I submitted those slips on 8/2/16 and never received an approval or a denial from Lt. Luna until he texted me on Sunday 9/11/17 [*sic*] at 4pm and told me I must report to work on those days or else. Also, he told me last August that the 111st [Street] position was opening and he was giving me the spot since I was next in line, when I asked him in October 2016 once the spot opened if I was going there his response was NO, you chose your family over your job, you used your FMLA so No you are not getting that spot. He also stated I was going to send you back to the jail but Superintendent Queen told me to be sympathetic towards your situation.
>
> Also, I was also on the 7-3 shift before my disability (4/14/17) but when I came back (10/11/17) that also was taken away and given to my partner who has less seniority than me and is bided to the afternoon shift. Where I am bided to the 6-2 shift.
>
> I feel if I go into further detail I will be retaliated against and be sent back to RCDC because we are always threatened about that (that is the or else I speak of). This is not the first time this has happened to me. There has been plenty more incidents than those I listed.

[69] ¶ 56 (Response); [69-3] (errors in original).

Queen emailed her back, "Call 0078"; when Plaintiff did, Commander Clemmons answered but Plaintiff could also hear Queen in the background. [84] ¶¶ 25–26. Clemmons, after placing Plaintiff on hold, transferred her to Luna's line. *Id.* ¶¶ 26–27. According to Plaintiff, Luna picked up and began screaming, "What do you mean I threatened you?", to which Plaintiff responded, "[y]ou've threatened me to go back to the jail on numerous times [*sic*]." *Id.* ¶¶ 27–28. When Luna continued to yell, Plaintiff interjected, "I cannot handle you talking to me this way. I can't handle it no

[*sic*] more. I can't do it. I'm just going to file a complaint, don't worry about anything, it's done." *Id*. Luna responded, "your days are approved" and hung up. *Id*. ¶ 29. There is no indication that Plaintiff submitted a complaint after this call or that Queen (or Clemmons) took any action. *Id*. ¶ 30. Later that month, Luna again told Plaintiff she could not use FMLA, or she would be sent back to the Jail. *Id*. ¶ 32.

Then, on January 9, 2018, Plaintiff asked Luna for another FMLA day. *Id*. ¶ 33. When she followed up by email, Luna responded in large, boldface font, "I am trying to secure coverage. I will approve it when that has occurred!!!!" *Id*. ¶ 37. It is not clear whether Luna approved her request, but Plaintiff took off the day. *Id*. ¶ 38.

Also in January, Plaintiff states Luna came up behind her at the DVC and rubbed her shoulders. *Id*. ¶ 34. Plaintiff responded, "what are you doing? Leave me alone", to which he replied, "oh you're crabby." *Id*. In turn, Plaintiff said, "no, I'm just doing my job" and walked away. *Id*. She did not tell Luna that he made her uncomfortable or report the incident to anyone. [69] ¶¶ 37–38.

Finally, Plaintiff used an FMLA day on April 17, 2018; on April 24, she asked Luna to take another FMLA day in May. *Id.* ¶¶ 60–61. In response, on April 27, 2018, Plaintiff was removed from her Remote Booking position and assigned back to the Jail. *Id*. ¶ 62. The parties dispute who decided to send Plaintiff back. *Id.* ¶¶ 8, 65; [84] ¶ 39. Plaintiff insists that Luna, Giunta and Queen jointly decided to move her back. [84] ¶ 39. Defendants argue that Luna had no authority to reassign officers to the Jail and Giunta made the decision. [69] ¶ 65; [84] ¶ 39. To that end, Giunta testified that he reassigned Plaintiff to the Jail because her time off requests in 2018

had created an operational burden. [69] ¶ 66. According to Giunta, Remote Booking needs appropriate coverage to prevent erroneous discharges, extended detentions, and litigious proceedings. *Id*.

### C.   Plaintiff's Complaints Following Transfer Back to the Jail

A few days after Plaintiff returned to the Jail, Plaintiff's Union Steward Mark Robinson told Giunta that Luna had been sexually harassing Plaintiff. [84] ¶ 40. The parties remain silent on how and when Robinson learned about the possible sexual harassment. Giunta did not report it to anyone but told Robinson to "report it immediately" if he had knowledge of such conduct. *Id*. (response).

On May 10, 2018, Plaintiff filed a complaint against Luna with the Office of Professional Review ("OPR"). [69] ¶¶ 70. She alleged Luna had sexually harassed her and retaliated against her for taking FMLA leave. *Id*. OPR initiated an investigation the next day and HR also contacted Plaintiff a few days later to confirm that she would not have to report to or communicate with Luna and offered to move her to an earlier shift at the Jail. *Id*. ¶ 71.

An OPR investigator interviewed numerous individuals including Luna who denied making the sexually harassing comments. *Id*. ¶¶ 72, 73; [60-10]. The OPR investigator also reviewed hundreds of documents and emails; prepared written interview summaries; and issued a lengthy formal report. [69] ¶¶ 72, 73. Ultimately, OPR found Plaintiff's sexual harassment claims unsubstantiated; as to Plaintiff's FMLA retaliation allegations, OPR concluded: "Remote Booking is an assignment that requires employees to be present and unscheduled leave disrupts operations. [Plaintiff] is better able to utilize her FMLA from assignments within Receiving that

do not require the transfer of employees from other locations. [Plaintiff's] pay and benefits did not change, and she was returned to the assignment in Receiving where she chose her work hours and days off per the Teamsters Collective Bargaining." *Id.* This lawsuit followed.

## II.  Motion to Strike Sur-rebuttal Report of Dr. Lawson

Before addressing Defendants' motion for summary judgment, the Court considers Defendants' motion to strike the sur-rebuttal report of Plaintiff's expert, Dr. Angela Lawson, [61].  Plaintiff produced Dr. Lawson's sur-rebuttal report on June 15, 2021, sixty-seven days after Defendants produced their rebuttal expert's report. *Id.*  ¶¶ 8–9, 13.  Defendants argue that this renders the sur-rebuttal report untimely pursuant to Rule 26(a)(2)(D)(ii) and ask the Court to strike it as a sanction under Rule 37(c)(1).  *See* [61] ¶¶ 11–15; Fed. R. Civ. P. 26(a)(2)(D)(ii) & 37 (c)(1).

Rule 26(a)(2)(D)(ii) requires parties to produce expert rebuttal evidence within thirty days after the other party's disclosure. Fed. R. Civ. P. 26(a)(2)(D)(ii).  Rule 37(c)(1) provides that a party may not use expert testimony at trial if it did not timely disclose the expert's report "unless the party was justified in missing the deadline or the untimeliest of the disclosure was harmless." *Dura Auto. Sys. of Ind. v. CTS Corp.*, 285 F.3d 609, 615 (7th Cir. 2002); *see also* Fed. R. Civ. P. 37(c)(1).  Courts enjoy broad discretion to determine whether a discovery violation is harmless or justified and need not make explicit findings.  *See David v. Caterpillar*, 324 F.3d 851, 857 (7th Cir. 2003).  Courts use four factors to guide their determination: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party

to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.*

Plaintiff agrees that she failed to timely produce her expert's sur-rebuttal report but argues that her delay was substantially justified and harmless. [64] ¶ 4. First, she contends that she produced the report late because her counsel took maternity leave beginning March 22, 2021. *Id.* ¶¶ 6–7. Second, she argues that the delay: (1) did not harm Defendants because they did not rely on expert evidence in support of their summary judgment motion; (2) will not disrupt the trial; and (3) was not the result of willfulness or bad faith. *Id.* ¶¶ 10–13.

The circumstances here do not warrant striking Plaintiff's sur-rebuttal report. First, Plaintiff's maternity leave provides some justification for the late production. Although Plaintiff should have sought the Court's leave to produce an untimely report, Defendants do not explain how Plaintiff acted willfully or in bad faith. Second, the delay proves harmless to Defendants. Defendants complain that they deposed Dr. Lawson before she produced her sur-rebuttal report, *id.* ¶ 17, but Defendants deposed Dr. Lawson before they even issued their own expert's rebuttal report, *id.* ¶¶ 7–8. Therefore, Defendants had already deposed Dr. Lawson before her sur-rebuttal report became due. Furthermore, as Plaintiff points out, [64] ¶¶ 11–12, Defendants filed their summary judgment motion two weeks after Plaintiff produced her sur-rebuttal report and did not cite to or rely on any expert evidence. As will be clear below, this Court also did not consider or rely upon expert evidence in deciding Defendants' summary judgment motion. Finally, the Court has not set a trial date,

10

so this untimely report will not "hamper the [D]efendants' preparation of the case." *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000) (holding that facts did not warrant striking untimely supplemental expert reports where plaintiff timely disclosed the experts' initial reports well before trial).

Accordingly, the Court denies Defendants' motion to strike, [61]. Lastly, if expert discovery needs to be reopened for limited purposes prior to trial, the parties remain free to request that relief from the Court, if consistent with Rule 11.

## III.  Defendants' Summary Judgment Motion

### A.  Standard of Review

Summary judgment is proper where there exists "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden to establish that there exists no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party identifies sufficient evidence to demonstrate there exists no genuine issue for trial, then the burden shifts to the nonmoving party to show that an issue of material fact exists. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021–22 (7th Cir. 2018). In determining whether a genuine issue of material fact exists, this Court will construe all facts and reasonable inferences in the light most favorable to the non-moving party. *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). But the non-moving party "must do more than simply show

that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Barnes v. City of Centralia*, 943 F.3d 826, 832 (7th Cir. 2019). Thus, a mere "scintilla of evidence" does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

### B. Analysis

#### 1. Hostile Work Environment Claims (Counts I & III)

Plaintiff alleges that Luna's sexual harassment and the FMLA pushback she faced created a hostile work environment on account of her gender in violation of Title VII. [1] (Count I & III). To prove her claim, Plaintiff must demonstrate: (1) she was subjected to unwelcome conduct; (2) the conduct was based on her sex; (3) it was severe or pervasive enough to create a hostile work environment; and (4) there exists a basis for employer liability. *See Roby v. CWI, Inc.*, 579 F.3d 779, 784 (7th Cir. 2009) (citing *Whitaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005)).

Defendants argue that Plaintiff cannot make out a hostile work environment claim based on the FMLA pushback because she cannot establish that those issues were motivated by her gender. [59] at 4–11. As to Luna's sexual harassment, Defendants do not dispute that his alleged five sexually crude comments and shoulder rub may constitute unwelcome conduct based on Plaintiff's gender, *id.* at 4–6, but they argue that it was not sufficiently severe or pervasive and, even if it was, Plaintiff cannot hold Defendants liable as a matter of law,[4] *id.* at 4–11.

---

[4] Defendants also argue that Plaintiff cannot prevail on a "retaliatory hostile work environment" theory. [59] at 11–12. A retaliatory hostile work environment claim requires: (1) an objectively and

### a. Hostile Work Environment Based on FMLA Issues.

To constitute harassment actionable under Title VII, the unwanted treatment—even if not of a sexual nature—must be "motivated by gender." *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 808 (7th Cir. 2001). In other words, "[i]nappropriate conduct that is 'inflicted regardless of sex [ ] is outside the statute's ambit.'" *Id.* (quoting *Holman v. State of Ind.,* 211 F.3d 399, 403 (7th Cir.2000)). Thus, to survive a motion for summary judgment, Plaintiff must present sufficient evidence to "permit a reasonable factfinder to conclude that her" gender caused the complained-of conduct. *Ortiz v. Werner Enters.*, 834 F.3d 760, 765 (7th Cir. 2016).

Plaintiff presents evidence of two male correctional officers that allegedly received more favorable FMLA treatment: (1) her partner, Chris Rosenhagen; and (2) Remote Booking Officer CR. [68] at 17; [84] ¶¶ 51, 52. Rosenhagen took FMLA paternity leave and served a 100-day suspension but was not transferred back to the Jail. [84] ¶ 52. Officer CR was approved for FMLA on May 15, 2016 and remained in his remote booking assignment "as of November 28, 2016." *Id.* ¶ 51. Plaintiff contends that "this speaks to the level of gender discrimination" because "Luna, Giunta and Queen left the men alone when they took FMLA, but targeted Perez because she was female." [68] at 17.[5]

---

subjectively offensive work environment; (2) created in retaliation for protected behavior; (3) where the offensive conduct was severe or pervasive; and (4) there exists a basis for employer liability. *See Flanigan v. Office of the Chief Judge*, 893 F.3d 372, 375 (7th Cir. 2018). In response, Plaintiff states she "is not clear" what Defendant means by "retaliatory hostile work environment." [68] at 16. Therefore, Plaintiff waives any such theory, and the Court need not consider it.

[5] Plaintiff only offers this evidence in the context of her Title VII retaliation claim. [68] at 17–18. By failing to also raise this evidence to support her hostile work environment claim, she waives the argument because the Court is not obligated to search for and construct "the legal arguments open to parties, especially when they are represented by counsel." *Beard v. Whitley Cty. REMC*, 840 F.2d 405,

With respect to Rosenhagen, Plaintiff fails to explain how his FMLA paternity leave and 100-day suspension compares to her intermittent FMLA leave. FMLA leave (or a suspension) served in a single block of time materially differs from intermittent FMLA leave taken one or two days at a time over years.[6] Plaintiff also does not state whether Rosenhagen received pushback for taking his FMLA paternity leave. Despite Luna's (and arguably Giunta and Queen's) alleged hostility to Plaintiff's leave requests, she intermittently took her leave for nearly two years before she was transferred back to the Jail. [69] ¶¶ 40, 62. Thus, the fact that Rosenhagen took paternity leave or served a suspension, standing alone, does not indicate he received favorable treatment.[7]

Similarly, with respect to Remote Booking Officer CR, Plaintiff fails to show how much FMLA he took, whether it was intermittent, or address whether he also faced pushback. Further, she only gives his employment status as of November 28, 2016, six months after his FMLA leave approval. *Id.* Again, Plaintiff stayed in remote booking for over two years after her initial FMLA approval.[8]

---

408–09 (7th Cir. 1988). But because Plaintiff generally argues that her FMLA request treatment constituted gender discrimination for purposes of her hostile work environment claim, [68] at 11, and fleshes out this argument in the context of her Title VII retaliation claim, *id.* at 17–18, the Court still considers it here.

[6] Plaintiff's short-term disability leave from April 2017 to October 2017 compares more closely to her partner's FMLA paternity leave and 100-day suspension. She does not allege that Defendants treated her differently than her partner with respect to her disability leave. [84] ¶ 17.

[7] Plaintiff also states that Luna made her punch out from work to bid for a new shift while Rosenhagen did not have to punch out. [68] at 17. But elsewhere she states that she believes "*everyone else* in remote booking did not have to punch out to bid." [84] ¶ 67 (emphasis supplied). Other females worked in remote booking, *id.* ¶ 50, and thus the record undermines any inference that Plaintiff had to punch out on account of her gender.

[8] Interestingly, in her Additional Statement of Facts, Plaintiff also identifies a female correctional officer in Remote Booking that Luna supervised and who took FMLA leave but was not transferred

Plaintiff also suggests that, because Luna made sexually offensive comments and touched her shoulder, one can assume everything else he did during that period was gender-based. [68] at 17 ("It's not a leap that Luna's increasingly aggressive behavior was based on Plaintiff's sex given Luna's obscene comments, unwanted physical touching, and further aggressive behavior").[9] The Seventh Circuit has made clear in discrimination cases that "suspicious timing alone rarely is sufficient to create a triable issue." *Moser v. Ind. Dep't of Corr.,* 406 F.3d 895, 905 (7th Cir. 2005); *see also Wyninger v. New Venture Gear, Inc.,* 361 F.3d 965, 981 (7th Cir. 2004) ("'mere temporal proximity' is not enough to establish a genuine issue of material fact"); *cf. Scaife v. Cook Cnty.,* 446 F.3d 735, 742 ("[c]lose temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment *provided* that there is *other evidence* that supports the inference of a causal link." (emphasis added)). By the same logic, Plaintiff cannot create a material issue of fact simply because Luna allegedly made sexually harassing comments to her during the same 2-year period that he pushed back on her FMLA requests.

Overall, Plaintiff fails to present evidence of gender animus related to her FMLA leave problems. *See Winsley v. Cook Cnty.,* 563 F.3d 598, 605 (7th Cir. 2009) (finding plaintiff's "bare assertions" that she was discriminated against because of her race "are not sufficient to establish a link between [her] race and her treatment");

---

back to the Jail. [84] ¶ 50. This also undermines her claim that Luna, Giunta, and Queen targeted Plaintiff because she was female.

[9] Again, Plaintiff only raises this in the context of her Title VII retaliation claim.

15

*Karazanos v. Navistar Intern. Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991) ("[A] plaintiff's speculation is not sufficient defense to a summary judgment motion.").

To the contrary, the record suggests that she faced issues with her FMLA requests because Luna and Giunta were hostile to scheduling challenges in Remote Booking, regardless of whether it involved a male or female employee. For example, according to Plaintiff, Luna repeatedly threatened to send Plaintiff back to the Jail because of her FMLA leave requests and told her she "could not take FMLA while working at Remote Booking." [69] ¶¶ 8 (response), 46, 50; [84] ¶¶ 14–16, 22–24. Superintendent Giunta also admits he threatened to send Plaintiff back to the Jail because of scheduling issues with her FMLA requests. *Id*. ¶¶ 53, 69 (response); [84] ¶ 60.

Accordingly, Luna's sexually offensive comments and unwanted touching constitute the only conduct conceivably actionable under Title VII for purposes of Plaintiff's hostile workplace environment claims.

### b. Hostile Work Environment Based on Sexual Harassment.

The parties dispute whether Luna's alleged sexual harassment was sufficiently severe or pervasive and whether Defendants may be held liable for Luna's conduct. [59] at 4–6; [68] at 9–12.

For conduct to qualify as "severe or pervasive" harassment under the act, it must be so egregious as "to alter the conditions of the victim's employment in a significant way." *Bilal*, 326 F. App'x at 957. The alleged harassing conduct here presents a close question under Seventh Circuit precedent. But the Court need not

resolve it because, as set out below, the evidence establishes as a matter of law that Defendants are not liable for Luna's alleged conduct.

Employers face strict liability for a supervisor's harassment if the "harassment culminates in a tangible employment action." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 745 (1998); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). A "tangible employment action" is "a significant change in employment status, such as discharge, demotion, or undesirable reassignment." *Burlington*, 524 U.S. at 744. If there was no tangible employment action, however, then an employer may avoid strict liability provided: (1) it exercised reasonable care to prevent and promptly address any sexual harassment; and (2) Plaintiff unreasonably failed to utilize any preventive or corrective opportunities put in place by the employer or to otherwise avoid harm. *See Burlington*, 524 U.S. at 742; *Faragher*, 524 U.S. at 806; *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 627–28 (7th Cir. 2019). This defense, known as the *Ellerth/Faragher* defense, constitutes an affirmative defense on which Defendants bear the burden of proof. *See Burlington*, 524 U.S. at 765.[10]

---

[10] The parties also dispute whether Luna qualifies as Plaintiff's supervisor or merely her co-worker, [59] at 7; [68] at 12–13. An employer only incurs liability for co-worker harassment if it acted negligently in discovering or remedying the harassment. *Loughman v. Malnati Org., Inc.*, 395 F.3d 404, 407 (7th Cir. 2005). This dispute, however, is not material here. As discussed below, even if Luna qualifies as Plaintiff's supervisor, Plaintiff does not present a qualifying "tangible employment action" and Defendants established a valid *Ellerth/Faragher* defense (including a showing that Defendants exercised reasonable care for purposes of the defense); this reasonable care finding also foreclose liability even if Luna only qualifies as Plaintiff's co-worker.

### i. Tangible Employment Action

Plaintiff argues that she suffered a tangible employment action when she was reassigned from Remote Booking to the Jail in April 2018. [69] at 13. Defendants counter that the Jail transfer cannot constitute a tangible employment action because Plaintiff fails to attribute that action to her gender. [83] at 20. The record supports Defendants' position.

The Supreme Court has made clear that a supervisor's harassment must "*culminate[]* in a tangible employment action." *Burlington*, 524 U.S. at 765 (emphasis added). To that end, the Seventh Circuit rejects "tangible employment action" theories where the plaintiff fails to tie the "actions to the alleged sexual harassment." *Murray v. Chi. Transit Auth.*, 252 F.3d 880, 887 (7th Cir. 2001); *see also Hill v. Am. Gen. Finance, Inc.*, 218 F.3d 639, 642 (7th Cir. 2000) (finding Defendants may raise *Ellerth/Faragher* defense where Plaintiff did not establish a "causal connection" between the adverse action and sexual harassment).

As established above, Luna's sexually offensive comments and unwanted shoulder rub constitute the only possible actionable conduct in the record for her hostile environment claim. Plaintiff fails to present any evidence, however, that her transfer back to the Jail related to Luna's alleged sexual misconduct. Although she may speculate that Luna wanted to return her to the Jail because she rebuffed his sexual advances, mere speculation does not suffice. *Karazanos*, 948 F.2d at 337.

Furthermore, the parties dispute whether Luna participated in the decision to transfer Plaintiff back to the Jail, [69] ¶¶ 4, 65, but Plaintiff herself surmises that the decision was made *jointly* by Luna, Giunta and Queen, *id*. ¶ 64. Yet, Plaintiff

18

admits she did not explicitly complain about Luna's alleged sexual harassment until May 2018. [69] ¶¶ 28–29, 32, 34, 36, 37–38. In the end, Plaintiff fails to show how Giunta or Queen's decision could be tied to harassment of which they were unaware.

Accordingly, Plaintiff fails to present sufficient evidence of a "tangible employment action" tied to her hostile work environment claim and Defendant may raise a *Ellerth/Faragher* defense.

### ii. Ellerth/Faragher Defense Prong 1: Whether Defendants Exercised Reasonable Care

Under the *Ellerth/Faragher* defense's first prong, an employer must show that it exercised "reasonable care to prevent and correct promptly any sexually harassing behavior." *Burlington*, 524 U.S. at 742. Defendants offer evidence of the Sheriff's Office's anti-harassment policies, training, and reporting procedures. [59] at 9–10; [69] ¶¶ 12–14. They also argue that they promptly and appropriately responded to Plaintiff's May 2018 OPR Complaint. [59] at 10; [69] ¶¶ 12, 70–71.

While not required as a matter of law, the "existence of an appropriate anti-harassment policy will often satisfy" the first prong of the *Ellerth/Faragher* defense. *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 810 (7th Cir. 1999) (citing *Scrivner v. Socorro Indep. Sch. Dist.*, 169 F.3d 969, 971 (5th Cir. 1999)). Here, the undisputed evidence confirms that the Sheriff's Office employs a robust anti-discrimination policy that prohibits sex-based discrimination, harassment and retaliation and sets out reporting procedures and responsibilities. [60-8] § 104.4; *see also* [69] ¶¶ 12, 14; [60-8] § 104.3, 104.8. It provides numerous methods to report misconduct, including to supervisors, HR, the OPR, or even the Cook County Independent Inspector General,

19

IDHR, or the EEOC. [69] ¶ 13; [60-8] §§ 104.4, 104.5.3. It also creates a process for formal and informal investigations into alleged misconduct. [69] ¶ 13; [60-8] §§ 104.5–104.7. Of course, these policies failed to prevent Luna's behavior (if true), "but the law does not require success—it only requires that an employer act reasonably to prevent sexual harassment." *Shaw*, 180 F.3d at 812.[11]

Plaintiff argues that, notwithstanding these policies, Defendants failed to act reasonably because they did not promptly investigate her complaints and failed to stop the harassment. [68] at 14. Plaintiff argues that Defendants' response to her complaints "was so negligent as to turn Luna's harassment into sex discrimination." [68] at 12. She further claims that Defendants "forced [her] to bear the costs of solving the problem" and that she "told FIVE individuals of superior rank about Luna's offensive behavior, and yet an investigation *or inquiry* was not undertaken" until she "filed her OPR Complaint in May 2018." *Id.* at 14 (emphasis in original).

In assessing an employer's investigation, "a prompt investigation is the hallmark of a reasonable corrective action." *Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 636 (7th Cir. 2009) (quoting *Lapka v. Chertoff*, 517 F.3d 874, 984 (7th Cir. 2008)). A court's "focus is not whether the perpetrators were punished by the employer, but whether the employer took reasonable steps to prevent future harm." *Porter*, 576 F.3d at 637 (citing *Lapka*, 517 F.3d at 984).

---

[11] Importantly, the Sheriff's Office also provides a copy of its policy to employees; requires written confirmation of receipt; and mandates yearly policy training. [69] ¶ 14; [60-8] § 104.8; *cf. Faragher*, 524 U.S. at 808 (finding an employer failed to meet the first prong of the defense because it failed to disseminate its policies to employees). Here, Plaintiff received numerous trainings on the sexual harassment policy. [69] ¶ 14.

Here, Plaintiff's arguments fail to appropriately distinguish between her FMLA-related complaints and her complaints about sexual harassment. Plaintiff alleges that she complained to "FIVE individuals of superior rank." [68] at 13. Assuming she means Lieutenant DiCaro, Giunta, Queen, Director Reyes, and Union Stewart Robinson,[12] this argument fails because, as discussed above, Plaintiff did not complain to these individuals about Luna's sexual harassment.[13]

The question of whether her superiors responded appropriately or reasonably to Plaintiff's earlier FMLA complaints stands apart from whether they responded appropriately and reasonably to Plaintiff's sexual harassment complaint. The record shows Plaintiff did not complain about sexual harassment until May 2018. An employer cannot be said to act unreasonably if it fails to investigate possible harassment about which it did not know. *See, e.g., Shaw*, 180 F.3d at 812; *Trahanas v. Northwestern Univ.*, 2020 WL 7641293, at *13 (N.D. Ill. Dec. 23, 2020) (rejecting plaintiff's claim that she complained to HR about harassment because her HR complaints were only about a promotion and pay raise); *Uriostegui v. Lumisource, LLC*, 2015 WL 1166330, at *3–4 (N.D. Ill. Mar. 11, 2015) (same where the complaints

---

[12] Plaintiff does not identify the referenced "FIVE individuals of superior ranks: [68] at 13; and she only cites to a statement of fact, which states: "CCSO did nothing to initiate an investigation into Luna's conduct until May 2018 when Plaintiff filed her OPR Report", [84] ¶ 56.

[13] Superintendent Giunta acknowledges that Union Steward Mark Robinson told him about Luna's possible sexual harassment in the two weeks between when Plaintiff returned to the Jail in April 2018 and filed her OPR Complaint in May 2018. [84] ¶ 40. Giunta's knowledge of the alleged harassment may constitute notice to Defendants since the sexual harassment policy requires supervisors (like Giunta) to report possible harassment. *See Valentine v. City of Chi.*, 452 F.3d 670 (7th Cir. 2006) (finding question of fact whether employer was on notice of sexual harassment based on complaints plaintiff made to a supervisor). But OPR initiated its investigation promptly after Giunta spoke to Mark Robinson, so even if Giunta did not report it, this does not demonstrate Defendants failed to respond properly or promptly.

21

where only about general "mistreatment" and not about "sexual harassment"); *Schoiber v. Emro Mktg Co.*, 1999 WL 825275, at (N.D. Ill. Sept. 21, 1999) (finding plaintiff's call to a supervisor that he felt "uncomfortable working" with his alleged harasser was too "vague and did not clearly suggest that he was suffering sexual harassment."). As the Seventh Circuit emphasized in *Montgomery v. American Airlines, Inc.*: employers "need not divine complaints from the ether, guessing at the subjective suspicions of employees. Any aggrieved employee must at least report— clearly and directly—nonobvious policy violations troubling him so that supervisors may intervene." 626 F.3d 382, 392 (7th Cir. 2010).

The record also shows that the Defendants promptly initiated a formal investigation following Plaintiff's May 2018 complaint. [69] ¶¶ 70, 72–73. The OPR investigator interviewed numerous individuals; reviewed documents and emails; thoroughly documented the investigation; and issued a lengthy formal report. *Id.* Soon after Plaintiff filed her complaint, HR also contacted her to confirm that Plaintiff would not have to report to or communicate with Luna and offered Plaintiff the option to switch shifts. *Id.* ¶ 71. These facts demonstrate that OPR reasonably and appropriately investigated Plaintiff's allegations.[14]

---

[14] Plaintiff also argues that Defendants unreasonably "forced [her] to bear the costs of solving the problem," [68] at 14, but she entirely fails to explain her conclusory assertion. Again, this failure constitutes waiver. *See supra* at 13 n.4. Regardless, to the extent this refers to her transfer back to the Jail, Plaintiff again conflates the relevant issues. As discussed above, the evidence does not indicate that her transfer related to Luna's sexual harassment. And Defendants certainly did not order the transfer as part of the investigation into her May 2018 complaints, since she was transferred back to the Jail in April.

Plaintiff also alleges that "Luna continues to harass her." [68] at 7.[15] A "stoppage of harassment" may show an investigation's effectiveness, but "this is not the sole factor"; while a court should not ignore hindsight, "the ultimate question is whether the response was likely to succeed *ex ante*" not whether it actually succeeded. *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 995 (7th Cir. 2011) (citing and quoting *Porter*, 576 F.3d at 637).

Plaintiff offers four incidents as support of the alleged ongoing harassment. First, she contends that Luna has called the Jail security office when Plaintiff is on duty; when she answers, he says "oh, wrong number" and hangs up. [68] at 7; [84] ¶ 41. Second, Luna once called the security office and asked Plaintiff to call Lieutenant Lewis for him. [84] ¶ 42. When Plaintiff called Lewis via radio, Plaintiff could hear herself on Luna's radio through the phone. *Id.* According to Plaintiff, this fact means that Luna's and Lewis' radios were "on the same band" and Luna could have radioed Lewis directly. *Id.*; [60-4] at 69:23–70:20. Third, Plaintiff states Luna unexpectedly answered the phone when she called the records department. [84] ¶ 43. When she told him, "I'm not allowed to speak with you and you know that, can I please speak to a sergeant," he hung up on her. [60-4] at 72:13–15; [84] ¶ 43. Fourth, Plaintiff

---

[15] Notably, Plaintiff did not directly raise this alleged continued harassment in opposing application of the *Ellerth/Faragher* defense. [68] at 12. She only raised it in her general factual recitation. *Id.* at 7. Ordinarily, this may constitute another waiver. But because Defendants bear the burden of proof on the *Ellerth/Faragher* defense, the Court considers Plaintiff's factual recitations of post-investigation harassment to evaluate whether Defendants meet their burden as a matter of law.

allegedly ran into Luna while he gave a Jail tour and "he smiled and laughed and said 'hi, Officer Perez.'"  [60-4] at 72:19–23.[16]

These alleged interactions do not raise doubt about whether Defendants conducted a reasonable investigation.  The Seventh Circuit's opinion in *Berry v. Delta Airlines, Inc.* proves instructive.  260 F.3d at 808.  There, the plaintiff argued that her employer failed to reasonably address her sexual harassment complaint because her alleged harasser continued to harass her after the investigation.  *See id.* at 810.  The court, affirming summary judgment for the defendant, found that the employer's investigation was thorough, prompt and reasonable.  *See id.* at 813.  It also found that, even if the later conduct was generally harassing, the alleged harasser's "sexual overtures definitively ceased after [plaintiff] complained" to her employer and the plaintiff "presents no evidence demonstrating that any of the subsequent harassment was gender-based."  *Id.* at 814.

Here, too, Plaintiff does not allege that Luna made sexually explicit comments or physically touched her after she filed her OPR complaint.  Nor does she allege how his ongoing conduct constitutes gender animus.  Plaintiff may subjectively feel that he continues to harass her, but her subjective perception is not enough.  Furthermore, Plaintiff does not allege that she complained to Defendants about these post-investigation interactions with Luna.  Again, Defendants cannot address harassment

---

[16] Defendants ask the Court to strike these allegations because Plaintiff did not include them in her Complaint.  [83] at 12.  According to Defendants, Plaintiff impermissibly attempts to "amend her complaint" through these new allegations.  *Id.*  Hostile work environment claims involve "aggregate conduct," however, and "[b]y adding more 'individual acts' as evidence of a hostile work environment claim, a plaintiff does no more than strengthen her evidentiary record."  *Vance v. Ball Univ.*, 646 F.3d 461, 469 (7th Cir. 2011).

that Plaintiff fails to report. Defendants have met their burden to establish they exercised reasonable care to prevent and correct Luna's alleged sexual harassment.

### iii. *Ellerth/Faragher* Defense Prong 2: Whether Plaintiff Unreasonably Failed to Avail Herself of Preventive or Corrective Opportunities

The second prong of the *Ellerth/Faragher* defense requires Defendants to establish that Plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [Defendants] or to avoid harm otherwise." *Shaw*, 180 F.3d at 813 (*quoting Ellerth*, 524 U.S. at 763). In the briefing, Plaintiff explicitly declined to "address the reasonableness" of her own actions; instead, she contends only that Defendants asserted a "perfunctory and undeveloped" argument that effectively waived the issue for the defense. [68] at 14 n.5. Not so. Defendants supported their argument with facts and record citations. [59] at 10–11. Because Defendants bear the burden to establish the *Ellerth/Faragher* defense, however, the Court still considers whether "the record is sufficiently developed" to "fairly apply the *Faragher-Ellerth* standard" at this stage. *Hill*, 218 F.3d at 642.

Here, the undisputed facts carry Defendants' burden. The Sheriff's Office employs sexual harassment policies and procedures with numerous methods, both informal and formal, to report possible misconduct. Plaintiff knew of these policies. Yet, she did not report Luna's sexual harassment until two years after it allegedly began. [69] ¶¶ 28–29, 32, 34, 36, 37. This suffices to establish that Plaintiff failed to take reasonable measures to mitigate harm. *See, e.g., Mackenzie v. Potter*, 219 F. App'x 500, 502 (7th Cir. 2007) (holding seven-month delay in reporting rendered

plaintiff's behavior unreasonable); *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004) (same for two-year delay); *Gawley v. Ind. Univ.*, 276 F.3d 301, 312 (7th Cir. 2001) (same for four-month delay); *Hill*, 218 F.3d at 643 (same for five-month delay).

Elsewhere in her brief, Plaintiff insists that she did not report Luna's harassment because she was scared and feared retaliation. [68] at 4, 7. The Seventh Circuit, though, has made plain that "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty…to alert the employer to the allegedly hostile environment." *Hill*, 218 F.3d at 644 (quoting *Shaw*, 180 F.3d at 813); *see also Montgomery*, 626 F.3d at 391–92 ("[F]ear of unpleasantness cannot excuse [the plaintiff] from using the company's complaint mechanisms"); *Trahanas*, 2020 WL 7641293, at *12 (granting summary judgment based on the *Ellerth/Faragher* defense even though plaintiff's fear of retaliation allegedly caused her failure to report)). As the *Shaw* Court emphasized, "the law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." *Shaw*, 180 F.3d at 813 (quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1038 (7th Cir. 1998)).

Defendants have established the *Ellerth/Faragher* defense. Accordingly, the Court grants summary judgment on Plaintiff's hostile work environment claims (Counts I & III).

### 2.     Title VII Retaliation Claim (Count VIII)

Defendants also seek summary judgment on Plaintiff's Title VII retaliation claim. [59] at 12–14.  Title VII prohibits employers from retaliating against employees who engage in activity protected by the statute. *See* 42 U.S.C. § 2000e–3(a).  To prove Title VII retaliation, Plaintiff must establish that she: (1) engaged in statutorily protected activity; (2) suffered a materially adverse action; and (3) there exists a causal link between the two. *See Murray*, 252 F.3d at 890.  Plaintiff argues that because she complained about Luna's harassment and rebuffed his sexual advances, he retaliated against her by denying her 111th Street transfer request and transferring her back to the Jail.  Defendants disagree, arguing that Plaintiff cannot establish any elements of a Title VII retaliation claim.

### a.     Statutorily Protected Activity

Plaintiff argues that she engaged in statutorily protected activity when she: (1) emailed Superintendent Queen on November 1, 2007; (2) told Luna on the phone, "I'm just going to file a complaint"; and (3) rebuffed Luna's sexual advances.  [68] at 16, 16 n.8; [83] ¶¶ 28–29.

As to her email to Queen, an informal complaint to an employer may constitute statutorily protected activity under Title VII, but "the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).  Plaintiff concedes that her email to Queen did not explicitly complain of gender discrimination or sexual harassment, but she insists that she implied it when she stated:

27

> Also, I was also on the 7-3 shift before my disability (4/14/17) but when I came back (10/11/17) that also was taken away and given to my partner who has less seniority than me and is bided to the afternoon shift. Where I am bided to the 6-2 shift.
>
> I feel if I go into further detail I will be retaliated against and be sent back to RCDC because we are always threated about that (that is the or else I speak of). This is not the first time this has happened to me. There has been plenty more incidents than those I listed..
>
> I am telling you in confidence as my supervisor.

[68] at 15; [84] ¶ 24 (errors in the original). Here, Plaintiff argues that she implied gender discrimination in the email when she referenced her "partner who has less seniority" because her partner is, in fact, male. [68] at 15. Not so. Plaintiff shared the DVC Remote Booking assignment with only one partner and scheduling disputes naturally would involve him. Nothing about her shift assignment dispute with a junior male co-worker, standing alone, conceivably signals gender discrimination. Furthermore, even though her email references "plenty more incidents than those I listed," her email only lists incidents related to her FMLA requests and Luna's threats to send Plaintiff back to the Jail. In fact, she explicitly states elsewhere in the email: "I feel like I am being discriminated against because of FMLA." [84] ¶ 24. Nothing in the email implies sexual harassment or gender discrimination. Accordingly, it fails to constitute statutorily protected activity for the purposes of her Title VII claim. *Tomanovich*, 457 F.3d at 663 ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." (citing *Gleason v. Mesirow Fin., Inc.*, 118 F.4d 1134, 1147 (7th Cir. 1997))).

For the same reasons, Plaintiff did not engage in statutorily protected activity when she told Luna, "I'm just going to file a complaint", [84] ¶ 28. This comment came after Queen shared Plaintiff's email with Commander Clemmons, who then transferred Plaintiff's call to Luna. *Id.* ¶¶ 24–28. By Plaintiff's own description of her conversation with Luna, however, she never directly or implicitly told him she planned to file a complaint for gender discrimination or sexual harassment. *Id.* ¶ 28. Instead, she merely told him, "You've threatened me to go back to the jail on numerous times [*sic*]." *Id.* Quite simply, this is not enough to survive summary judgment.[17]

Yet, even if Plaintiff had presented a statutorily protected activity, her claim also falters on the other elements of the claim, as set out below.

### b. Materially Adverse Action

Plaintiff identifies two materially adverse actions: (1) the refusal to transfer her to 111th Street Courthouse; and (2) her transfer back to the Jail.

---

[17] Lastly, the Court notes the circuit split on whether a person engages in statutorily protected activity by simply rejecting a supervisor's sexual advances. *See Tate v. Executive Mgmt. Srvcs., Inc.*, 546 F.3d 528, 532 (7th Cir. 2008) (acknowledging a circuit split between the fifth and eight circuits). As Plaintiff acknowledges, the Seventh Circuit has not yet ruled on the issue. *See* [68] at 16 n.8; *Tate*, 546 F.3d at 532; *Murray*, 252 F.3d at 880 (declining to resolve the issue). Some courts in this district reject such a theory, and at least one has accepted it based upon the facts of that case. *Compare Farfaras v. Citizens Bank & Trust of Chi.*, No. 01-cv-8720, 2004 WL 2034077, at *2 (N.D. Ill. Aug. 30, 2004) *and Jones v. Cnty. of Cook*, No. 01-cv-9876, 2002 WL 1611606, at *3 (N.D. Ill. July 17, 2002), *and Bowers v. Radiological Soc'y of N. Am. Inc.*, 57 F. Supp. 2d 594, 599 (N.D. Ill. 1999), *with Estes v. Ill. Dept. of Human Srvcs.*, No. 05-cv-5750, 2007 WL 551554, at *4 (N.D. Ill. Feb. 16, 2007) (permitting the theory because refusal "was one of the very few options that [plaintiff] had for opposing sexual harassment" since the employer failed to tell plaintiff about a harassment policy, her harasser was highly ranked and close with senior officers, and others warned plaintiff against complaining). The Court need not answer this open question today, however, because, even if Plaintiffs' rebuffs constitute protected activity, she still fails to causally link it to any materially adverse action, as discussed below.

Not everything that "makes an employee unhappy is an actionable adverse action." *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012) (quoting *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009)). Instead, the complained-of action must be "materially" adverse, meaning the action "might dissuade a reasonable worker from" engaging in the statutorily protected activity. *See Brown*, 569 F.3d at 790 (citing *Burlington*, 548 U.S. at 68). While the Seventh Circuit adopts a broad view of "materially" adverse, it requires "more than inconvenience or an alteration of job responsibilities." *Hilt-Dyson v. City of Chi.*, 282 F.3d 456 (7th Cir. 2002). A "materially" adverse action may include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* at 465–66 (quoting *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 510 (7th Cir. 1999)).

### i.     111th Street Transfer Denial

Plaintiff fails to establish that her 111th Street transfer denial constitutes a materially adverse action. She does not argue her job responsibilities, pay or benefits would have changed. She argues only that she preferred it because the 111th Street Courthouse was closer to her home. [68] at 3. The Seventh Circuit's decision in *Dandy v. United Parcel Services, Inc.*, 388 F.3d 263 (7th Cir. 2004), forecloses such a theory. The *Dandy* Court held that the defendant's refusal to grant a transfer request did "not constitute an adverse employment action" because the "request was for a

30

lateral transfer offering parallel pay, benefits, and responsibilities," *Id.* at 275; *cf. Brown*, (finding that a denial of a transfer request "might be an adverse employment action, provided the transfer would have resulted in higher pay or benefits."). So too, here, Plaintiff does not identify any material difference in pay, benefits, or responsibilities that would justify a finding that denial of her transfer request to the 111th Street Courthouse constitutes a material adverse action.

### ii.    Jail Transfer

Plaintiff's argument fares somewhat better as to the Jail transfer. Although Plaintiff agrees that she kept the same benefits, pay and overtime opportunities, [69] ¶¶ 18, 23, 63, 70–71, 74, she argues that her responsibilities at the Jail differed from those at the DVC because the Jail is a "more dangerous environment" where correctional officers process more inmates, many of whom have been charged with more serious, violent offenses, [68] at 3, 13; [84] ¶¶ 8–9. According to Plaintiff, "with violent offenders that come in, you could get spit on, punched. There's been fights like crazy there at the jail." [69] ¶ 18 (response).

As discussed above, "materially adverse" depends on considerations "unique to a particular situation," *Hilt-Dyson*, 282 F.3d at 465–66, and the overarching consideration remains whether the action may "dissuade a reasonable worker" from engaging in statutorily protected activity, *Brown*, 569 F.3d at 790. A more dangerous job (even if one keeps the same general responsibilities and pay) may suffice to meet this definition. In response, Defendants insist that the Jail is no more violent than the DVC, and that Plaintiff's job is equivalent to her Remote Booking assignment at the DVC. [59] at 13; [69] ¶¶ 18, 23, 63, 70–71, 74; [83] at 12; [84] ¶¶ 6–8. But this

conflict constitutes a disputed issue of material fact for a factfinder to decide and thus, Defendants are not entitled to summary judgment on the "materially adverse" issue.

### c.     Causation

Even if there exists a disputed issue of material fact on whether the Jail transfer constitutes a material adverse action, Plaintiff cannot maintain her retaliation claim unless she can causally link the transfer to some statutorily protected activity.   Specifically, to survive summary judgment, the record must "contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused" the materially adverse action.  *Igasaki v. Ill. Dept. of Fin. and Prof. Reg.*, 988 F.3d 948, 959 (7th Cir. 2021) (internal citations omitted).  The record here, however, contains no such evidence.

Hoping to causally connect her Jail transfer to a retaliatory motive, Plaintiff insists, in a conclusory fashion, that Luna, Queen and Giunta jointly decided to move Plaintiff back to the Jail because "all three knew of [her] complaints."  [68] at 17. Additionally, she offers two similarly situated males that Defendants allegedly treated more favorably: (1) her partner, Chris Rosenhagen and (2) and Remote Booking Officer CR.  [68] at 17; [84] ¶¶ 51, 52.  Plaintiff's showing, however, falls short.

First, the timing of her rebuffs and transfer do not establish causation.  Luna made his first sexually harassing comment in March 2016 and the last instance of alleged sexual harassment came in January 2018 when he rubbed her shoulders. [69] ¶¶ 28, 37.  She was not transferred to the Jail until almost three months later.  *Id.* ¶

32

62.    Second, the evidence does not show Queen and Giunta knew about her complaints.  Once again, Plaintiff fails to distinguish between complaints about FMLA leave and complaints about sexual harassment or discrimination; the record shows that Plaintiff did not complain about sexual harassment or gender discrimination until after her transfer.  She further fails to present any evidence that Queen or Guinta knew about Luna's alleged sexual harassment before they transferred her back to the Jail.  In the end, Plaintiff offers only speculation that Luna retaliated against her because she rebuffed his sexual advances.  *See Winsley*, 563 F.3d at 605 (7th Cir. 2009) (speculation does not suffice to survive summary judgment).

Turning to her offering of two "similarly situated" males, Plaintiff fails to demonstrate that Rosenhagen and Officer CR's FMLA leave is "directly comparable" to her intermittent FMLA leave.[18]  *See supra* at 14–15.  Furthermore, even if Plaintiff's complaints or rebuff of Luna's advances constitute Title VII protected activity, she remains silent on whether Rosenhagen or Officer CR engaged in Title VII protected activity.  Silence does not suffice to meet her burden.[19]

---

[18] Of course, the law permits a plaintiff to establish Title VII retaliation by identifying a similarly situated individual "who did not engage in the statutorily protected activity and received better treatment."  *Brown*, 700 F.3d at 1106 (citing *Harper v. C.R. England, Inc.*, 687 F.3d 297, 309–10 (7th Cir. 2012)).  If Plaintiff presents such evidence, then the burden shifts to the Defendants to establish a non-retaliatory basis for the materially adverse action.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. (1973) (originally setting out this burden-shifting framework).  To establish that an employee is "similarly situated," however, a plaintiff "must show that there is someone who is directly comparable to her in all material respects."  *Winsley*, 563 F.3d at 605 (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)).

[19] Plaintiff's arguments with respect to Rosenhagen and Officer CR conflate the causation element of a retaliation claim with that of a gender discrimination claim.  That is, for a gender discrimination claim, a plaintiff must establish a causal link between her protected class (*i.e.*, her gender) and the materially adverse action.  *Brown*, 700 F.3d at 1104.  For a retaliation claim, however, a plaintiff must

Based upon the record, Plaintiff does not present a triable issue of fact as to her Title VII retaliation claim. Accordingly, the Court grants Defendants motion for summary judgment as to Count VIII.

### 3.    FMLA Retaliation (Count XII)

Finally, Defendants move for summary judgment on Plaintiff's FMLA retaliation claim. [59] at 14–16. Employers may not retaliate against employees who exercise or attempt to exercise FMLA rights. 29 U.S.C. § 2615(a)(2). Thus, an "employer cannot use an employee's use of FMLA leave as a negative factor in promotion, termination, and other employment decisions." *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (citing *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 978 (7th Cir. 2008)). An FMLA retaliation claim requires proof of: (1) an FMLA-protected activity; (2) a materially adverse action; and (3) discriminatory or retaliatory intent. *See Pagel*, 695 F.3d at 631.

Defendants do not dispute that Plaintiff engaged in FMLA-protected activity. Instead, they argue that Plaintiff cannot identify a materially adverse employment action or establish the requisite intent. [59] at 14–15. In addition, Defendants argue that, to the extent Plaintiff's claim rests on the 111th Street transfer denial, it is time-barred. *Id.* at 15–16.

---

establish a causal link between her statutorily protected activity (*e.g.*, filing a complaint about gender discrimination or sexual harassment) and the materially adverse action. *Id.* at 1106. Plaintiff focuses on her status as a female, not her alleged statutorily protected activity, [68] at 17–18 ("Luna, Giunta and Queen left the men alone when they took FMLA, but targeted Perez because she was female"). Regardless, even if she theoretically could establish causation for her retaliation claim by showing a connection between her gender and a materially adverse action, she fails to do so.

34

### a. Materially Adverse Action

Courts define "materially adverse action" the same for FMLA retaliation and Title VII retaliation claims. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). Plaintiff offers the same alleged materially adverse actions for her FMLA retaliation claim that she offered for her Title VII retaliation claim: (1) Luna's refusal to transfer her to the 111th Street location; and (2) her transfer back to the Jail. [68] at 15–16.

As discussed above, the 111th Street transfer denial does not constitute a materially adverse action. Accordingly, her FMLA retaliation claim fails as a matter of law as to that transfer denial.[20] Nevertheless, as discussed above, there exists a disputed issue of material fact as to whether the Jail transfer constitutes a materially adverse action. Therefore, the Court turns to the "intent" requirement.

### b. Discriminatory or Retaliatory Intent

Plaintiff argues that the following facts establish Defendants' retaliatory intent with respect to the Jail transfer:

(1) Luna told her he would not transfer her to 111th Street because she chose her family over her job when she took FMLA;

(2) Luna responded harshly to her FMLA leave requests, was slow to respond, and told her on multiple occasions that she would be transferred back to the Jail if she used her FMLA; and

(3) the timing of her FMLA requests and her transfer back to the Jail.

[68] at 18; *see also* [69] ¶ 50; [84] ¶¶ 24, 32, 37, 39.

---

[20] Because it does not constitute a materially adverse action, the Court need not consider Defendants' statute of limitations argument.

The Court agrees that these facts may evidence retaliatory intent. According to Plaintiff, Luna repeatedly threatened to send her back to the Jail for taking FMLA leave. Even if the 111th Street transfer denial does not constitute an actionable adverse action, Luna's alleged comments go to his intent. If he made these comments—a credibility determination for a jury—it indicates his hostility to her FMLA leave requests. The timeline also circumstantially suggests intent. She requested additional FMLA days on April 24, 2018, and she got transferred back to the Jail on April 27, 2018. *Id.* ¶¶ 38–39.

Defendants counter that Giunta, not Luna, decided to transfer Plaintiff; therefore, only Giunta's intent is relevant. [59] at 14–15. They insist that Giunta had legitimate reasons to transfer her back. *Id.* In doing so, however, Defendants agree that she got transferred back to the Jail because of her FMLA requests. [59] at 14. They simply argue that this transfer was motivated by "operational burdens" not "animus." *Id.*[21] Overall, there exist disputed issues of material fact regarding intent. Accordingly, the Court denies Defendants' motion for summary judgment on Plaintiff's FMLA retaliation claim relating to her transfer back to the Jail.

---

[21] Even if Plaintiff's FMLA leave created an "operational burden" for remote booking, FMLA requires employers to reinstate an employee to a previous position or an "equivalent position." 29 C.F.R. § 825.214. Defendants fail to provide any authority that their "operational burden" defense would justify a transfer to a materially different position.

## IV.    Conclusion

For the reasons set out above, the Court grants Defendants' Motion for Summary Judgment [58] as to Plaintiff's hostile work environment claims (Counts I & III) and Title VII retaliation claims (Count VIII) and denies it as to Plaintiff's FMLA retaliation claim (Count XII) to the extent the claim relates to her transfer back to the Jail. The Court also denies Defendants' motion to strike the sur-rebuttal report of Dr. Lawson, [61].

Dated: March 28, 2022          Entered:

John Robert Blakey
United States District Judge